

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
GREENEVILLE DIVISION**

Clerk, U. S. District Court
Eastern District of Tennessee
At Greeneville

| | | |
|---|---|---|
| IN THE MATTER OF SEARCH OF STORED | ) | |
| ELECTRONIC DATA CONTAINED IN A BLACK | ) | Case No. 2:23-MJ-258 |
| SAMSUNG MOBILE PHONE WITH IMEI | ) | |
| 351223622877705 | ) | TO BE SEALED |
| | ) | |

**AFFIDAVIT IN SUPPORT OF**

**AN APPLICATION FOR A SEARCH WARRANT**

I, Homeland Security Investigations Task Force Officer Jonathan Mulkey, being

first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application for a search warrant for a black Samsung

mobile phone with an IMEI of 351223622877705 (hereinafter the "**TARGET PHONE**"),

which was seized as evidence from BRENT PRICE (Also known as "B") on November 30,

2023, during BRENT PRICE's arrest in Johnson City, Tennessee. The **TARGET PHONE** is

now located in secure evidence storage under the control of Homeland Security

Investigations. On a white sticker located on the back of this **TARGET PHONE**, the Model

is listed as "SM-S236DL{GP}" and shows the provider to be "TracFone Wireless, Inc.".

Additional information and/or identifiers for the cellular telephone are unattainable without

conducting a search of the cellular telephone.

1

2. I am a Task Force Officer (TFO) with Homeland Security Investigations (HSI), a component of U.S. Immigration and Customs Enforcement (ICE) and have been so employed since September 20, 2022, when I completed the HSI TFO Training Course. I began my law enforcement career as a sworn police officer in the City of Kingsport, Tennessee in July of 2017. While with the Kingsport Police Department I have served as a Patrol Officer, Police Explorer Advisor, Field Training Officer, a SWAT Operator, and I am currently assigned to the Second Judicial Drug Task Force where I serve as a Special Agent. As a Special Agent, I am tasked with investigating drug related crimes, primarily, but not limited to, in Sullivan County, Tennessee. During the initial months of my law enforcement career, I received several hours of training in the topics of criminal and constitutional law and basic narcotics investigations from the Blount County Sheriff's Office Regional Training Academy, which I attended between the months of August and November of 2017. These courses included training in drug trafficking organizations, drug recognition, criminal investigations, search and seizure, and drug investigations. Following my graduation of the Police Academy, I then completed a rigorous field training program where I was trained to be a patrol officer by senior Field Training Officer's. During this program, I gained knowledge and hands-on experience in conducting numerous illegal narcotics related investigations. Since successfully completing this training program in 2018, I have initiated or participated in hundreds of narcotics investigations involving either the possession of, or the sale and delivery of, numerous types of illegal narcotics. I have completed forty hours of specialized training in the field of criminal investigations which was taught by the Kingsport Police Department's Criminal Investigations Unit. I was selected to be a founding member of the Kingsport Police Department's "Power Shift" in 2019. While assigned to this shift, one of my primary duties

2

were to combat the influx of narcotics, and narcotics related criminal offenses in the City of Kingsport through proactive patrols, interdiction, and saturation of known high-crime areas in the community. During this assignment, I worked alongside other selected patrol officers as we conducted narcotics trafficking interdiction details, "plain clothes" details conducting surveillance on suspected narcotics trafficking suspects, and saturation patrols in known high intensity drug trafficking areas. As a result, I gained experience in investigating hundreds of narcotics related crimes which resulted in offenders being prosecuted and convicted in Sullivan County, Tennessee. Upon showing knowledge and proficiency in my capabilities as a patrol officer, I was offered the position of Field Training Officer in May of 2020. Upon accepting this assignment, I passed along my knowledge and experience to multiple police officer recruits by teaching them how to conduct investigations, of which most pertained to narcotics related crimes. I have participated in executing search warrants involving narcotics in the capacity of a SWAT Team Operator for the Kingsport Police Department, of which I was selected to be a part of in May of 2021. In August of 2021, I was selected and assigned to the Second Judicial Drug Task Force. Since my assignment to the Second Judicial Drug Task Force, I have gained additional experience in the field of narcotics investigations by partaking in joint investigations or operations with the U.S. Drug Enforcement Administration, the Bureau of Alcohol, Tobacco and Firearms, the Federal Bureau of Investigation, Tennessee Bureau of Investigation, Homeland Security Investigations, and various other law enforcement agencies. On September 24th of 2021, I completed 40-hours of Advanced VICE and Narcotics training in Nashville, Tennessee. On October 8th of 2021, I completed a 40-hour Basic S.W.A.T. School at the Kingsport Police Department. Between November 8th through the 12th, I completed 36 hours of instruction on Narcotics

3

Investigations in Chattanooga Tennessee provided by the Tennessee Narcotics Officers Association. On March 3rd, 2022, I completed a 24-hour course on Phone and Social Media Analysis through Penlink in Nashville, Tennessee. On May 13th of 2022, I completed a 40-training course on the topic of Transnational Gangs and Cartels. On September 20th of 2022, I completed the Homeland Security Investigations (HSI) training course titled Task Force Officer (TFO) Course. During my assignment to the 2nd Judicial District Drug Task Force, I have actively assisted or conducted multiple drug investigations including the identification of drug offenders, the locations of drug offenders' houses, and how drug offenders conduct their illegal activities. To successfully conduct these investigations, I have utilized a variety of investigative techniques and resources, including physical and electronic surveillance and various types of informants and cooperating sources. Through these investigations and training, I have become familiar with the methods used by traffickers to smuggle and safeguard narcotics, to distribute narcotics, and collect and launder related proceeds. I am aware of the sophisticated tactics they routinely use to attempt to thwart any investigation of their narcotics organizations. My knowledge of these tactics, which include the utilization of numerous different cellular telephones, counter surveillance, elaborately planned distribution schemes tied to legitimate businesses, false or fictitious identities, and coded communications and conversations, has been particularly useful and relevant to these investigations.

3. The search of the **TARGET PHONE** is for information regarding the acquisition, attempted acquisition, possession, and/or distribution of methamphetamine, a Schedule II controlled substance, by BRENT PRICE and other co-conspirators both known and unknown to me at this time, as well as methods utilized to achieve such goals by BRENT PRICE and other co-

4

conspirators both known and unknown to me at this time. Information sought includes data related to communication (including but not limited to call histories, text messages, instant messages, and voice mails) between BRENT PRICE and other co-conspirators both known and unknown to me at this time, regarding transportation arrangements, instructions, order lists, photographs of methamphetamine, financial arrangements, and other logistical aspects related to the manufacture, distribution, dispensing, and/or possession of methamphetamine, or the commission of money laundering in violation of 21 U.S.C. § 846 and 841(a) and 18 U.S.C. § 1956.

4. Based upon my experience in conducting criminal investigations of violations of federal controlled substance laws, I know that drug trafficking organizations (DTOs) have developed numerous methods to insulate their illegal activities from law enforcement detection. These methods are common to major DTOs to varying degrees of sophistication.

5. I know that members of DTOs often utilize cellular telephones that are held in the name of other living or fictitious persons and change telephone numbers frequently to limit law enforcement officials' ability to identify and track suspects' call histories.

6. I know that members of DTOs often utilize cellular telephones to arrange drug transactions, communicate with customers and co-conspirators, and store contact information of customers and co-conspirators. I also know that this information can then be shared with other co-conspirators to assist in the flow of communication amongst the group.

7. I know that members of DTOs often utilize computers and electronic storage devices such as cellular telephones to research the PRICE and availability of controlled substances, and to acquire, pay for, and keep records of controlled substances purchases. DTOs also utilize code

5

words for quantities and types of various controlled substances that are being purchased, sold, and/or transferred to avoid detection by law enforcement officials.

8. I know that members of DTOs often utilize cellular telephones to share photographs with co-conspirators, including photographs of controlled substances that they want to purchase. This practice is common when someone in the organization is utilizing a co-conspirator to purchase controlled substances on their behalf.

9. I know that members of DTOs utilize various individuals to make their purchases. In many instances, these purchasers are asked to travel to a city or area of town they may not be familiar with to make the purchase. I also know that these purchasers commonly use their cellular telephones to navigate to houses or stores in unfamiliar locations, and the recovery of such addresses can benefit law enforcement in identifying unknown co-conspirators and locations.

10. I know that electronic devices, such as cellular telephones, computers, and other electronic storage media can store information for long periods of time. This information can sometimes be recovered with forensic tools. Additionally, I know that most cellular telephones have the capability to access the internet and therefore can be used by individuals to access their email accounts.

11. I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium or viewed via the internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools.

6

12. In turn, members of DTOs will order confederates of the organization to destroy records, cancel cellular telephone service, and delete computer files associated with the criminal enterprise. I know that in dynamic and evolving situations, it is imperative to eliminate the chance of the destruction of property. Subjects involved in the trafficking of controlled substances can quickly destroy records associated with their criminal activity, including electronic data and computer files.

13. This affidavit is provided in support of an application for a search warrant that would authorize the forensic examination of the aforementioned cellular telephone, particularly described in Attachment A, for the purpose of identifying electronically stored data, particularly described in Attachment B.

14. Based on my training and experience, and the facts as set forth in this affidavit, there is probable cause to believe that violations of 21 U.S.C. § 846 and 841(a) and 18 U.S.C. § 1956 have been committed by BRENT PRICE.

15. There is also probable cause to search the cellular phone described in Attachment A for evidence of these crimes, and contraband or fruits of these crimes, as described in Attachment B.

## HISTORY OF INVESTIGATION

16. HSI and the Second Judicial District Drug Task Force (2nd DTF) are conducting a criminal investigation of BRENT PRICE (AKA "B") regarding drug trafficking, conspiracy to traffic drugs (namely methamphetamine), and money laundering in violation of 21 U.S.C. § 846 and 841(a) and 18 U.S.C. § 1956.

17. At the beginning of 2023, Agents with the 2nd DTF, and HSI began an investigation into a methamphetamine trafficking organization in Sullivan County, Tennessee.

7

18.     Throughout this investigation, a reliable and confidential informant (CI) was utilized to provide information regarding the trafficking of illicit narcotics in Tennessee. This CI has additionally made numerous controlled narcotics purchases from multiple narcotics dealers and distributors. This information provided by the CI was proven accurate and was corroborated by Agents through surveillance, controlled narcotics purchases, and various other means.

19.     In May of 2023, this CI identified Daniel MORRIS as a large quantity methamphetamine distributor in the Sullivan County, TN community. As a result, this investigation consisted of completing controlled narcotics purchases from MORRIS using this CI. Throughout this investigation, Agents have learned the identity of other subjects involved in this drug trafficking organization.

20.     On June 6, 2023, during a controlled narcotics purchase from MORRIS, he informed the CI that his source of supply would be coming soon to bring more methamphetamine. Agents continued surveillance on 1335 Holston Drive, MORRIS's home. The following activity occurred after the controlled purchase.

   i)     At approximately 2:40 hours, I witnessed via surveillance a white 2022 Ford Expedition (Georgia license plate # CVD1245) arrive in the neighboring driveway at 1337 Holston Drive, which is an abandoned house that MORRIS and his associates are known to use for additional parking.

   ii)    The driver of this vehicle exits and begins pacing around, appearing to be waiting for someone. I checked this license plate through NCIC and learned that the vehicle is registered to Willie FREEMAN of Georgia. FREEMAN's NCIC check provided a

8

DMV license photograph of FREEMAN. I was able to confirm that the subject pictured was the same subject present during this surveillance.

iii)     FREEMAN gets back into the Ford, pulls forward slightly to a more obscure location, and then exits the vehicle again. FREEMAN then walks to the rear of the Ford, opens the trunk hatch, removes a coat, and lays it onto the ground behind the vehicle. FREEMAN then lays down onto the coat, crawls underneath the rear bumper of the Ford, and begins manipulating something out of view.

iv)     A white male subject, later identified as Casey BAYS, then walks into view of surveillance and joins FREEMAN at the rear of the vehicle. BAYS is carrying what appears to be a large stack of currency and places it into FREEMAN's trunk while FREEMAN is still underneath the Ford.

v)     FREEMAN is then observed removing large bags containing large quantities of what appears to be methamphetamine. During this time, BAYS retrieves a black trash bag and begins taking the methamphetamine from FREEMAN and placing it into the trash bag. Numerous bags, believed to be in kilogram quantities, are placed into BAYS' trash bag.

vi)     FREEMAN gets back up from underneath the Ford, then appears to collect the currency BAYS placed in the trunk. FREEMAN takes a large bundle, believed to be bulk cash that is now wrapped up into a bag, and crawls back underneath the vehicle. FREEMAN employs BAYS' assistance to tear off strips of duct tape to affix this bundle in the place of the methamphetamine. Once finished, FREEMAN crawls back out, stands up, and leaves. BAYS takes his trash bag, now full of numerous bundles of white or clear substance believed to be kilograms of methamphetamine, and walks

9

around to the rear of MORRIS' residence, to the same door that the CI had just used when completing the controlled purchase just a matter of 2 hours prior.

21. Federal Probation Officer Dang Ly in Georgia then received notification that Agents had checked FREEMAN's information through NCIC, due to FREEMAN being actively supervised on Federal probation following his arrest for trafficking cocaine. I contacted Officer Ly and learned FREEMAN's cellular phone number.

22. I then obtained a phone ping search warrant for this phone number and on June 28, 2023, FREEMAN was traffic stopped and found to be in possession of more than 10,000 grams of methamphetamine and more than 200 grams of cocaine.

23. FREEMAN was taken into Federal custody and has since provided Agents with consent to search the contents of his cell phones and provided information regarding the details of his drug trafficking organization. FREEMAN admitted to trafficking approximately 7-10 kilograms of methamphetamine to Casey BAYS in Bristol, TN on a regular basis, for about one year. FREEMAN additionally named a subject known only as "Brent" as one of his methamphetamine customers. The following is an excerpt from my written statement titled "*Interview of Willie Antonio FREEMAN*":

(a) **Brent, AKA "B", from Johnson City, TN.** *FREEMAN could not recall Brent's last name but stated that he is a black male with short dreadlocks. FREEMAN has Brent's phone number saved in his phone as "B". Brent would meet FREEMAN in Atlanta occasionally (Approximately 3-4 times), or FREEMAN would deliver drugs to him in Johnson City, TN (Approximately 6-7 times). Brent would purchase an average of 1 or 2 kilograms of methamphetamine from FREEMAN at a time. FREEMAN recalled that the least amount of methamphetamine that he has sold Brent was 18 ounces.*

10

*FREEMAN would drive to a trailer on Scott Circle in Jonesborough, TN, to meet Brent. FREEMAN initially stated that Brent did not have a car, but then recalled that Brent drives a red small, older sedan. FREEMAN charged Brent more, $4800 per kilogram of methamphetamine, due to Brent not buying as much as other customers.*

24.     During this interview, FREEMAN identified that phone number (423) 557-6208, which is saved under the name "B", to belong to "Brent." Prior to this interview, I learned the identity of "B" to be BRENT PRICE and printed a photograph of PRICE's license photograph. Using this photograph, FREEMAN identified "Brent" as BRENT PRICE.

25.     I was able to review the contents of FREEMAN's cell phone and observe conversations between BRENT PRICE and FREEMAN. The conversations on the phone are text message exchanges discussing meeting times and locations to exchange methamphetamine, and amounts. The messages corroborate the information FREEMAN provided.

26.     Using online investigative tools, I discovered that BRENT PRICE's cell phone number of (423) 557-6208 is serviced by TracFone, a subsidiary of Verizon Wireless.

27.     On September 11, 2023, I obtained a search warrant to begin receiving location data on BRENT PRICE's cell phone from Verizon Wireless. This location data was obtained and collected for 30 days.

28.     On October 10th, 2023, I presented charges against BRENT PRICE to the Federal Grand Jury in the Eastern District of Tennessee. Following this presentment, BRENT PRICE was indicted on Conspiracy to distribute 50 grams or more of Methamphetamine and Money Laundering in relation to his involvement in this investigation.

29.     On November 9th, 2023, Agents involved in this investigation received results from a subpoena to Verizon Wireless. The results confirmed that this same phone number remains

11

active. Additionally, Agents have confirmed that this cell phone number remains actively linked to BRENT PRICE's CashApp account. The following are facts learned from the CashApp subpoena:

i) BRENT PRICE listed the last four of his social security number, correct date of birth, addresses of 203 Hidden Oaks Drive, Johnson City, TN 37601, 159 Kate Street, Apartment 31, Johnson City, TN 37615, and 202 Wilson Avenue, Johnson City, TN 37604, and display name Brent Price.

ii) PRICE sent a total of $21,540.12 US Dollars (USD) between the dates 18 February 2023 and 17 September 2023. PRICE received a total of $25,576.94 USD between the dates 16 February 2023 and 18 September 2023.

iii) The following are the more significant amounts that PRICE sent and received:

(a) PRICE sent Amber Barber a total of $12,683 USD between the dates 18 February 2023 and 17 September 2023. Barber sent PRICE a total of $1,373 USD between the dates 26 February 2023 and 17 September 2023.

(b) PRICE sent CashApp user "Brandi" a total of $2,307 USD between the dates 03 April 2023 and 17 September 2023. Brandi sent PRICE a total of $5,702 USD between the dates 28 March 2023 and 30 August 2023.

(c) PRICE sent Lutoria Gill a total of $1,298.12 USD between the dates 27 February 2023 and 11 September 2023. Gill sent PRICE a total of $2,178 USD between the dates 06 April 2023 and 17 July 2023.

(d) PRICE sent Willie FREEMAN a total of $2,400 USD between the dates 23 March 2023 and 14 June 2023.

(e) Greg Harper sent PRICE a total of $2,391 USD between the dates 26 February 2023 and 02 June 2023.

(f) Rain Prie sent PRICE a total of $2,138.89 USD between the dates 13 April 2023 and 26 April 2023.

(g) Shea HOLLY sent PRICE a total of $1,685 USD between the dates 04 June 2023 and 05 September 2023.

30.     On November 15, 2023, I obtained a search warrant to obtain ping location information for PRICE's cellular phone to assist in locating PRICE to take him into custody.

31.     On November 30, 2023, HSI Special Agent (SA) John Bulla and I began to check locations in the Johnson City, TN area that were within the ping radius of PRICE's cellular phone. While checking the area of Lyle Street, SA Bulla and I observed PRICE traveling as a passenger in a silver Chrysler 200. The vehicle passed traveling in the opposite direction, and the driver was an unidentified white male. SA Bulla and I turned around to conduct a traffic stop on the vehicle. After a vehicle pursuit, during which PRICE was observed throwing a black firearm out of the vehicle's window, both PRICE and the driver were apprehended.

32.     During the arrest of PRICE, the **TARGET PHONE** was located lodged between PRICE's seat and the front passenger door of the vehicle. The firearm was located after SA Bulla and other agents conducted a search of the area. The only other phone located in the vehicle was in the pants pocket of the driver. Neither the driver nor PRICE claimed ownership of the **TARGET PHONE.**

33.     SA Bulla and I then transported PRICE to the federal courthouse in Greeneville, TN. PRICE was booked by the United States Marshals (USMS), taken for his initial appearance, and remanded to the custody of the USMS.

34.     The **TARGET PHONE** was taken as evidence and remains in secure evidence storage in the control of Homeland Security Investigations. The **TARGET PHONE** was placed into Airplane mode to preserve evidence, because of this, I cannot verify what the assigned phone number of the **TARGET PHONE** is without turning on the phone and examining it further.

35.     Based on my knowledge of PRICE's cell phone number being (423) 557-6208, the Ping location information utilizing this phone number to locate PRICE on November 30, 2023 and the location of the **TARGET PHONE** in relation to PRICE in the vehicle that day, I believe that the **TARGET PHONE** is PRICE's phone and upon further examination will show that **TARGET PHONE** is assigned to (423) 557-6208.

## TECHNICAL TERMS

36.     Based on training and experience, I use the following technical terms to convey the following meanings:

   a.   Wireless Telephone: A wireless telephone (or mobile telephone, or cellular telephone as used herein) is a handheld wireless device used for voice and data communication through radio signals. A wireless telephone sends signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the telephone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and telephone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other

14

information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

    b.  Digital Camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

    c.  Subscriber Identity Module (SIM) Card: a removable card found in certain wireless telephones that stores data unique to the user of the wireless telephone. Such data may include the international mobile subscriber identity (IMSI) number, mobile number, contacts, and text messages.

37.    Based on training and experience, I know that the above-described item to be searched is a Wireless Telephone which can also be utilized as a Digital Camera. Also, based on my training and experience, examining data stored on items of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

38.    As described above and in Attachment B, this application seeks permission to search for records and/or information that might be found on the subject cellular telephone, in whatever form they are found. Thus, the warrant applied for would authorize the seizure of electronic

15

storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

39.     Although some of the records called for by this warrant might be found in the form of user-generated documents (such as picture, and movie files), electronic storage media can contain other forms of electronic evidence as well:

   a.   Forensic evidence on a cellular telephone can indicate who has used or controlled the cellular telephone. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, electronically stored photographs, and correspondence (and the data associated with the foregoing, such as file creation and last accessed dates) may be evidence of who used or controlled the cellular telephone at a relevant time.

   b.   A person with appropriate familiarity with how a cellular telephone works can, after examining this forensic evidence in its proper context, draw conclusions about how the devices were used, the purpose of their use, who used them, and when.

   c.   The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance with particularity a description of the records to be sought, evidence of this type often is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on cellular telephones is evidence may depend on other information stored on the electronic device and the application of knowledge about how that device behaves. Therefore, contextual information necessary to

16

understand the evidence described in Attachment B also falls within the scope of the warrant.

38. I know that when an individual uses an electronic device to communicate with co-conspirators, the individual's device may serve both as an instrumentality for committing the crime and also as a storage medium for evidence of the crime. The device is an instrumentality of the crime because it can be used as a means of committing the criminal offense. From my training and experience, I believe that an electronic device used to commit crimes of the types suspected in this investigation may contain data that is evidence of how the electronic device was used, data that was sent or received, notes as to how the criminal conduct was achieved, records of internet discussions about the crime(s), and other records that indicate the nature of the offense(s).

## SEARCH METHODOLOGY TO BE EMPLOYED

39. It would be extremely difficult, if not impossible, to conduct a thorough on-site review of all the potential evidence in this case. Given these constraints, the search methodology to be employed as to computers, cellular telephones and other electronic storage media is as follows:

    a. All computers, cellular telephones and any form of electronic storage that could contain evidence described in the attachment of this warrant will be seized for an off-site search for evidence that is described in the attachment of this warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the items to human inspection in order to determine whether it is evidence described by

17

the warrant. It is anticipated that mirror copies or images of such evidence will be made if the failure to do so could otherwise potentially alter the original evidence.

b. Consistent with the information provided within this affidavit, contextual information necessary to understand the evidence, to identify the user/possessor of the electronic devices, and to establish admissibility of the evidence in subsequent legal proceedings will also be sought by investigative agents.

c. Additional techniques to be employed in analyzing the seized items will include (1) surveying various file directories and the individual files they contain; (2) opening files to determine their contents; (3) scanning storage areas, (4) performing key word searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are likely to appear in the evidence described in this affidavit and its attachments, and (5) performing any other data analysis techniques that may be necessary to locate and retrieve the evidence in this affidavit and its attachments.

d. Because it is expected that the computers, cellular telephones, and any form of electronic storage media may constitute (1) instrumentalities of the offense, (2) fruits of criminal activity, (3) contraband, or (4) evidence otherwise unlawfully possessed, it is anticipated that such evidence will not be returned to the owner and that it will be either forfeited or ultimately destroyed in accordance with the law at the conclusion of this case. However, if after careful inspection, investigators determine such computer, cellular telephones, and electronic storage media do not contain (1) instrumentalities of the offense, (2) fruits of criminal activity, (3) contraband, (4) evidence otherwise unlawfully possessed, or (5) evidence of the person who

18

committed the offense and under what circumstances the offense was committed, then such items seized will be returned.

e. Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize the execution of the warrant at any time in the day or night.

## CONCLUSION

40. Therefore, based on my training and experience, and the aforementioned facts which I believe to be true, I believe probable cause exists that the above-described evidence or a portion thereof will be found within the contents of the above-described cellular telephones when the warrant is served, and that such items would constitute evidence of a conspiracy and attempts to manufacture, distribute, dispense, and/or possess methamphetamine, in violation of 21 U.S.C. §846 and 841(a) and conspiracy to commit money laundering 18 U.S.C. §1956. With the above information, I formally request the issuance of a search warrant for the aforementioned cellular telephones.

41. The statements made in this affidavit are made based on the personal observations and investigation conducted by me, and information communicated or reported to me during the investigation by other participants in the investigation, as the content of this affidavit indicates. In addition, the information contained herein does not include every fact known by me.

Respectfully submitted,

19

Jonathan Mulkey

Jonathan Mulkey

Task Force Officer

Homeland Security Investigations

Subscribed and sworn to before me by telephone on December 12, 2023.

CYNTHIA RICHARDSON WYRICK
United States Magistrate Judge

# ATTACHMENT A

Property to be searched:

1. A black Samsung mobile phone with an IMEI of 351223622877705 (the **TARGET PHONE**), which was seized from BRENT PRICE, and is now located in secure evidence storage at the 2nd Judicial District Drug Task Force evidence room in Sullivan County, Tennessee.

2. Agents are initially authorized to search the **TARGET PHONE** for the limited purpose of determining what phone number is associated with the **TARGET PHONE**.

3. If the phone number assigned to the **TARGET PHONE** is (423) 557-6208 as provided in the affidavit, then the agents are authorized to continue to search the phone and seize items as detailed in Attachment B.

21





## ATTACHMENT B

Evidence to be seized:

1.    All records and or information on the **TARGET PHONE** described in Attachment A that relate to violations of 21 U.S.C. §§ 846 and 841(a) and 18 U.S.C. § 1956 including:

      a.  lists of customers and related identifying information;

      b.  types, amounts, and PRICE's of drugs trafficked as well as dates, places, and amounts of specific transactions;

      c.  any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

      d.  graphic images or movie files associated with weapons and/or drug trafficking.

      e.  any information of scheduled travel;

      f.  all bank records, checks, credit card bills, account information, and other financial records;

      g.  Text messages or similar test communications related to drug activity or conspiracy to distribute drugs;

      h.  Voicemail messages related to drug activity or conspiracy to distribute drugs;

      i.  Contact list and call logs which identify potential co-conspirators or customers involved in illegal drug activity.

2.      Evidence of user attribution showing who used or owned the **TARGET PHONE** at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

3.      As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.